AmSouth Investment Services, Inc. ("AIS"), and AmSouth Bank ("AmSouth") are defendants in an action filed by Usha Bhuta. The circuit court denied their motion to compel Bhuta to arbitrate her claims. AIS and AmSouth appealed. We reverse and remand.
Bhuta, on September 13, 1994, executed an AIS "Brokerage Customer Agreement" (the "Agreement"). The Agreement authorized AIS to open a "brokerage account," which was intended to "function in the same manner" as an account that she and her husband hadjointly opened with AIS in 1983. Indeed, according to Bhuta's complaint, the "new account was to function as the old account functioned except the purpose of the [new] account was to invest in tax free municipal bonds and the account was to be solely in [her name]." More specifically, according to Bhuta's complaint, "it was agreed . . . that when interest was paid, bonds matured or other monies were received, said funds would be transferred into an interest bearing account of Usha Bhuta at . . . AmSouth Bank."
The Agreement contained the following pertinent provisions:
 "I HEREBY NOTIFY THE CORRESPONDENT AND THE INSTITUTION THAT I AM ENTERING INTO THIS CUSTOMER AGREEMENT WITH AMSOUTH INVESTMENT SERVICES, INC. (`AMSOUTH INVESTMENT SERVICES'), A COPY OF WHICH WILL BE PROVIDED TO THE CORRESPONDENT, AND THE INSTITUTION. I HEREBY DIRECT AMSOUTH INVESTMENT SERVICES TO FORWARD TO THE CORRESPONDENT, AND (IF THE CORRESPONDENT AND THE INSTITUTION ARE SEPARATE ENTITIES) THE CORRESPONDENT TO FORWARD TO THE INSTITUTION, A COPY OF ALL CONFIRMATIONS RELATING TO SECURITIES TRADED BY ME THROUGH AMSOUTH INVESTMENT SERVICES. I HEREBY AUTHORIZE THE INSTITUTION TO CREDIT AND DEBIT MY DESIGNATED ACCOUNT WITH THE INSTITUTION, AND TO RECEIVE IN AND TRANSMIT FUNDS *Page 1122 
FROM SAID ACCOUNT WITH THE INSTITUTION IN PAYMENT OF SECURITIES TRANSACTIONS, UPON RECEIVING FROM AMSOUTH INVESTMENT SERVICES, THROUGH THE CORRESPONDENT OR OTHERWISE, ANY CONFIRMATIONS RELATING TO SECURITIES TRADED BY ME FOR MY ACCOUNT THROUGH AMSOUTH INVESTMENT SERVICES AND WITHOUT INQUIRY TO AMSOUTH INVESTMENT SERVICES AS TO THE ACCURACY OF SAID CONFIRMATIONS, ALL AS CONTEMPLATED BY THE TERMS OF THIS CUSTOMER AGREEMENT WITH AMSOUTH INVESTMENT SERVICES.
". . . .
 "WHEN SECURITIES ARE PURCHASED OR SOLD, COPIES OF CONFIRMATIONS OR SETTLEMENT JOURNALS SHOULD BE FORWARDED TO . . . AMSOUTH BANK N.A. WHO IS TO FORWARD THE SAME TO THE INSTITUTION IDENTIFIED HEREIN.
 "This agreement authorizes AmSouth Investment Services, Inc. (`AmSouth Investment Services'), as your agent, to purchase and sell Securities solely upon your order and for your account. As used in this agreement the words `you' and `your' mean the person(s) or entity(ies) signing this agreement, and the words `we,' `us,' and `our,' mean AmSouth Investment services acting as your agent. . . . The word `Institution' means the Financial Institution identified on your Brokerage Services Application, and the word `Correspondent' means the Servicing Correspondent identified on your Brokerage Services Application. If no Correspondent is identified on your Brokerage Services Application, the Correspondent shall be the Institution, and all references to the Correspondent shall be construed as references to the Institution.
". . . .
 "IT IS AGREED THAT ANY CONTROVERSY BETWEEN YOU AND THE CORRESPONDENT AND/OR THE INSTITUTION AND/OR AMSOUTH INVESTMENT SERVIVES [sic] AND/OR THE BROKER, THEIR RESPECTIVE OFFICERS, DIRECTORS, AGENTS OR EMPLOYEES, ARISING OUT OF THIS AGREEMENT OR YOUR BUSINESS WITH US, SHALL BE SETTLED BY ARBITRATION CONDUCTED IN ACCORDANCE WITH THE RULES OF THE NATIONAL ASSOCIATION OF SECURITIES DEALERS, INC. OR THE AMERICAN ARBITRATION ASSOCIATION, AS YOU MAY ELECT."
(Capital-letter emphasis original; other emphasis added.) Under the heading "Banking Reference" on the Agreement, Bhuta wrote: "AmSouth Bank," along with her account number.
Eventually, a dispute developed over the manner in which AIS and AmSouth were managing Bhuta's account. Specifically, her complaint alleged as follows:
 "9. . . . After the bond account was opened, money derived from the bond account was transferred to Ms. Bhuta's interest bearing account as agreed by the parties. Such transfer of funds to the interest bearing account of Ms. Bhuta continued until March, 1995 when large sums of money ceased being transferred to Ms. Bhuta's interest bearing account without instruction or direction from [her] and in breach of the express agreement entered into between Plaintiff and Defendants and in breach of the confidential relationship which existed between the parties.
 "10. From approximately March 1995 through March 19, 1998 large sums of money were accumulated and held by Defendant [AIS]. That interest was not paid on such funds nor were such funds invested by Defendant. Said funds were held without the permission or authority of Plaintiff. Neither Defendant AmSouth *Page 1123 
Bank nor Defendant [AIS] disclosed to Plaintiff that funds would be held without any type of investment earnings.
 "11. During the period of time from March 1995 to March 1998, the sums retained by Defendant [AIS] accumulated and grew to the sum of $393,539.21. Thus, the funds of Plaintiff were improperly, wantonly, and/or intentionally mismanaged, converted and/or interfered with by Defendants.
 "12. That alternatively, the funds of Plaintiff were negligently mismanaged, converted or interfered with by Defendants.
 "13. That Defendants improperly failed to invest or transfer said money and breached [their] fiduciary duties owed to the Plaintiff by failing to properly manage and invest said funds in violation of Defendants' representations, warranties, duties and obligations.
 "14. That Defendant AmSouth Bank is the parent company of Defendant [AIS] and is believed to have participated in this wrongful conduct or otherwise be responsible for the conduct of Defendant [AIS]."
On July 9, 1998, before Bhuta filed her complaint, AIS and AmSouth commenced arbitration proceedings pursuant to the arbitration provisions in the Agreement. On September 3, 1998, Bhuta filed her complaint, containing eight counts and stating claims of (1) misrepresentation and suppression; (2) breach of contract; (3) breach of fiduciary duty; (4) "negligence/wantonness"; (5) fraud; (6) conspiracy; and (7) conversion. In Count Eight, she sought a judgment declaring that the arbitration provision was "void and unenforceable."
On October 22, 1998, the trial court entered an order staying all judicial proceedings, pursuant to a motion by AIS and AmSouth. Bhuta filed a motion to "reconsider" and to vacate that order. On December 17, 1998, in an order containing no findings of fact or conclusions of law, the trial court vacated its October 22 order. The December 17, 1998, order was essentially an order refusing to compel arbitration.[1] AIS and AmSouth appeal from that order.
In support of the order denying arbitration, Bhuta makes two arguments requiring discussion. First, she contends that the order the defendants challenge was a proper exercise of the trial court's "authority to adjudicate whether [she] was fraudulently induced into the arbitration provision." Brief of Appellee, at 10. Second, she argues that AmSouth has no "standing to enforce the arbitration agreement." Id. at 18-19.
I. Fraudulent Inducement
It is well settled that claims of fraud in the inducement are, themselves, subject to arbitration, unless the alleged fraud directly involves the arbitration clause itself. Jones v. MerrillLynch, Pierce, Fenner Smith, Inc., 604 So.2d 332 (Ala. 1991); see also Prima Paint Corp. v. Flood Conklin Mfg. Co.,388 U.S. 395 (1967). In Jones, this Court explained:
 "Since Prima Paint, it has become clear that in cases involving claims of fraud in the inducement of a contract affecting interstate commerce, the court must first determine whether the fraud claim is directed solely at the arbitration clause itself. Coleman v. Prudential Bache Securities, Inc., 802 F.2d 1350, 1352 (11th Cir. 1986) (must be asserted that `arbitration clause itself, standing apart from the whole agreement, was induced by fraud'); Bhatia v. Johnston, 818 F.2d 418, 422 (5th Cir. 1987) (must be asserted that `arbitration clause alone, as opposed to the Customer Agreement generally,' had been induced *Page 1124 
by fraud); see also Schact v. Beacon Ins. Co., 742 F.2d 386, 390 (7th Cir. 1984). If so, the party opposing arbitration is entitled to a trial involving state law issues relating to the making of the arbitration clause."
604 So.2d at 337 (emphasis in original). However, in making this determination, the court is required to "look beyond the ad hoc
arguments of counsel" and to determine whether the "claim of fraudactually bears upon the entire agreement and upon the activities of the parties in general." Id. (emphasis added). We conclude that Bhuta's claim does that.
As indicated by Bhuta's complaint, the essence of this dispute is a claim that AIS and AmSouth "improperly, wantonly, and/or intentionally mismanaged, converted and/or interfered" with Bhuta's investments, by "failing to properly manage and invest said funds." Even more specifically, Count Five of her complaint, which set forth the fraud allegations, averred that AIS "represented to [Bhuta] that [it] would properly transfer interest and proceeds from the investment, sale or maturity of bonds to [Bhuta's] interest bearing account." The complaint further alleged that these representations "were false and [that] Defendants knew such representations were false at the time that they were made."
Bhuta argues that the arbitration clause was fraudulently induced. She bases this argument on the alleged representation that her individual account would "function in the same manner as" the joint account she and her husband had opened with AIS in 1983. Unlike the 1994 individual account, the 1983 joint account did not
contain an arbitration clause. Thus, Bhuta contends, AIS and AmSouth "fraudulently induced [her to agree to] the arbitration provision." We disagree.
The alleged representation that the 1994 account would function as the 1983 account did concerned the substance of the relationship between the parties. There is no allegation that the arbitration clause affected in any manner the function of theaccount. Indeed, "[t]he fact that the claims will be resolved in arbitration [does] not change the duties and obligations under thecontract nor [does] it change the rights and remedies available to the parties in arbitration," and "[t]he only distinction will be the forum in which those rights and remedies are resolved."Beaver Constr. Co. v. Lakehouse, L.L.C., 742 So.2d 159, 164
(Ala. 1999) (quoting with approval the appellant's reply brief) (emphasis added). The arbitration clause simply has nothing to do with the substance of the parties' relationship or the substance of their dispute. In short, "the claim of fraud actually bears upon the entire agreement and upon the activities of the parties in general," Jones, 604 So.2d at 337, not upon the arbitration clause in particular. Thus, Bhuta's allegations of fraud in the inducement do not provide a basis for avoiding arbitration.
II. Standing of AmSouth
Bhuta argues that AmSouth has no "standing to enforce the arbitration agreement," because, she insists, it is neither a signatory to, nor a beneficiary of, the agreement. Brief ofAppellee, at 18-19. She relies on Ex parte Stripling,694 So.2d 1281 (Ala. 1997), in which we directed the trial court to set aside an order compelling the arbitration of a dispute involving SouthTrust Bank. To be sure, the relationship of the financial entities in Stripling, namely, SouthTrust Bank and SouthTrust Securities, resembled the one in this case, just as the function of the "SouthTrust Securities account" the plaintiffs in Stripling
opened resembled the function of the account at issue in this case. Distinctions between the two cases, however, are dispositive.
Specifically, the arbitration clause in Stripling differed substantially from the one involved in this case. The clause inStripling provided: *Page 1125 
 "`All controversies which may arise between the undersigned [Stipling and Tobin] and you [SouthTrust Securities] as introducing or clearing broker, your agents or employees, concerning any transaction or the construction, performance or breach of this or any other agreement between us . . . shall be determined by arbitration.'"
694 So.2d at 1283. (Emphasis in original.) These emphasized provisions, when considered in connection with the theory ofrecovery, produced a result different from the one required in this case. In Stripling, investors sought to recover from SouthTrust Bank under the doctrine of respondeat superior, that is, the theory that SouthTrust Securities was an agent or employee of SouthTrust Bank. Id. at 1283.
Construing the arbitration provision in connection with the investors' theory of recovery, the Stripling Court explained:
 "SouthTrust is not alleged to be the `agent or employee' of SouthTrust Securities — to which person the agreement expressly applies, but the opposite, the principal of SouthTrust Securities. Thus, in the context of the relationship of the defendants alleged in the complaint, the agreement would appear not to apply to claims against SouthTrust."
Id. (Emphasis added.)
Thus, in Stripling, the arbitration provision covered only SouthTrust Securities and its "agents or employees," id. at 1283 (emphasis in Stripling), while the clause in this case expressly applies to every controversy between Bhuta, AmSouth Investment Services, "and the correspondent." (Emphasis added.) AmSouth isnamed in the Agreement and is defined as the "servicing correspondent." Also, Bhuta manually entered the name of AmSouth Bank on the face of the Agreement under the section "Banking Reference." Indeed, Bhuta does not allege or contend that the term "correspondent" refers to any other entity. AmSouth is, therefore, entitled to the benefit of the arbitration provision and does have standing to enforce it.
 III.
The trial court erred in refusing to compel arbitration. The December 17, 1998, order is, therefore, reversed, and the cause is remanded for further proceedings consistent with this opinion.
REVERSED AND REMANDED.
HOOPER, C.J., and MADDOX, HOUSTON, SEE, LYONS, BROWN, JOHNSTONE, and ENGLAND, JJ., concur.
[1] In a case where the trial court has refused to compel arbitration, "the proper method for seeking review is to appeal that order within 42 days." Ex parte Smith, 736 So.2d 604, 608
n. 2 (Ala. 1999); A.G. Edwards Sons, Inc. v. Clark,558 So.2d 358 (Ala. 1990).